**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                             **Criminal Action No. 3:11-cr-30
(JUDGE BAILEY)**

**DOUGLAS DEMETRIOUS STARLING,**

    **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT DENY DEFENDANT'S MOTION TO SUPPRESS [18]**

## I.  INTRODUCTION

Pending before the Court is Defendant Douglas Demetrious Starling's ("Defendant") Motion to Suppress (ECF No. 18), filed on September 29, 2011. On October 12, 2011, the Court held an evidentiary hearing on Defendant's motion. Defendant appeared in person and by counsel, Nicholas J. Compton, Assistant Federal Public Defender. The Government appeared by counsel, Erin K. Reisenweber, Assistant United States Attorney. Testimony was heard from Lieutenant Terry Stanley and Patrolmen Edward Chrisman and Justin Harper, all from the Martinsburg City Police Department. After considering the briefs and evidence offered by the parties, the undersigned Magistrate Judge now issues this Report and Recommendation, recommending that the District Court deny Defendant's motion. The reasons for recommending denial are set forth below.

## II.  PROCEDURAL BACKGROUND

On May 17, 2011, Defendant was indicted by the Grand Jury in a one (1) count Indictment. The Indictment charges Defendant with possession with the intent to distribute approximately 17.83 grams of cocaine base, also known as "crack," and approximately sixty-seven (67) tablets containing

a quantity of oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C).

### III. FINDINGS OF FACT

At the hearing held on October 12, 2011, Lieutenant Terry Stanley, an officer who has served twenty-two (years) with the Martinsburg City Police Department ("MCPD"), testified that he has lived at 2002 Alonzo Drive for nine years. The neighboring house, at 2004 Alonzo Drive, was owned by a Charles Michael Gerber at the time the incident with Defendant occurred. Lieutenant Stanley testified that he observed several people, including Defendant, residing at 2004 Alonzo Drive. He also noticed increased foot and vehicle traffic at Mr. Gerber's house. Particularly, Lieutenant Stanley noted that foot and vehicle traffic would arrive at all times throughout the day and night, and that vehicles only stayed for an average of five (5) minutes before leaving. After observing this behavior for some time and relying on his training and experience, Lieutenant Stanley believed that illegal activity, including drug activity, was occurring at 2004 Alonzo Drive. He shared these concerns with other members of the MCPD, including Patroman Edward Chrisman. Lieutenant Stanley testified that not only did he work with Patrolman Chrisman, but that he had known Patrolman Chrisman for twelve (12) years and was very good friends with him. Patrolman Chrisman has been to Lieutenant Stanley's home at 2002 Alonzo Drive for social visits more times than Lieutenant Stanley could count.

Lieutenant Stanley testified that he often observed a red Kia Rio parked outside of 2004 Alonzo Drive. He often saw Mr. Gerber and Defendant drive this Kia Rio, and he noted that the Kia was always outside of the residence except when Defendant would leave the house. Lieutenant Stanley testified that he often observed Defendant leave for twelve (12) to twenty-four (24) hours at a time; however, foot and vehicle traffic greatly increased each time Defendant returned to 2004

Alonzo Drive. Lieutenant Stanley shared this information with Patrolman Chrisman, and he also testified that Patrolman Chrisman had also had opportunities to observe the red Kia Rio during his visits to Lieutenant Stanley's home.

Patrolman Edward Chrisman, who has served with the MCPD for six (6) years, also testified at the evidentiary hearing. Patrolman Chrisman explained that he was familiar with the red Kia Rio because he had seen it parked at 2004 Alonzo Drive several times when visiting Lieutenant Stanley at 2002 Alonzo Drive. Patrolman Chrisman also testified that when visiting Lieutenant Stanley, he often saw vehicles approach 2004 Alonzo Drive for very short periods of time throughout all hours of day and night. During several occasions, he saw Mr. Gerber or Angela Holt, another resident of 2004 Alonzo Drive, get into the Kia and drive away. The Kia would leave for fifteen (15) minutes, come back to 2004 Alonzo Drive for an hour, leave for another fifteen (15) minutes, come back, and continue this pattern. Patrolmen Chrismen never saw Defendant operating the red Kia Rio and never saw Defendant personally during any of his visits to Lieutenant Stanley's house.

During the early morning of August 27, 2011, Patrolman Chrisman was sector officer for the area of Martinsburg encompassing Alonzo Drive. As he testified, the sector officer is the primary responding officer for a specific area of the city, and all calls, unless sent to another officer, are routed to that officer. Around 4:00 a.m., Patrolman Chrisman was maintaining a stationary patrol on the south side of the Domino's Pizza at the intersection of Wilson Street and Winchester Avenue. He did not have his headlights on during this stationary patrol. From this vantage point, Patrolman Chrisman observed a red Kia Rio stopped at the street light at the intersection of Wilson Street and Winchester Avenue. Once the Kia was again traveling southbound, Patrolman Chrisman left his stationary patrol and activated his headlights once he was behind the Kia. He testified that he

observed that it was the same Kia Rio he had seen at 2004 Alonzo Drive because of the New Jersey license plate and because he had the license plate number memorized. While following the Kia, Patrolman Chrisman was about fifteen (15) to twenty (20) feet behind the Kia, and he could see the license plate. He observed the Kia make a sudden right turn onto Alonzo Drive without signaling, and Patrolman Chrisman activated his emergency lights to make a traffic stop. Patrolman Chrisman had to apply his brakes when the Kia made the sudden right turn. Defendant stopped the Kia in the driveway of 2004 Alonzo Drive. Once he made the stop, Patrolman Chrisman noted that there were multiple individuals in the Kia, and he requested that dispatch send another officer to the scene. While waiting for another officer, Patrolman Chrisman approached the Kia and identified the driver as Defendant. Around this time, Patrolman Chrisman also noticed that Michael Kearn, the backseat passenger, appeared to be in a "state," and so he asked Kearn if he was alright.

Patrolman Justin Harper, an officer with the MCPD for almost five (5) years, responded to Patrolman Chrisman's traffic stop. Patrolman Harper was also aware of Lieutenant Stanley's concerns about 2004 Alonzo Drive through conversations at the police department. Patrolman Chrisman asked Defendant if there were any weapons or drugs in the vehicle, and Defendant replied that there were not. Patrolman Chrisman then asked Defendant for permission to search the vehicle, Defendant granted permission, and all occupants were ordered to step out of the vehicle. During this time, Patrolman Harper was speaking with Kearn, the backseat passenger. Patrolman Harper testified that Kearn appeared nervous, and that Kearn informed him that they had come from Hagerstown, Maryland. Kearn also told Patrolman Harper that he had seen Defendant stuff something down the front of his pants right before the stop. The front seat passenger, a Mr. Goodwin, also informed Patrolman Harper that he had seen Defendant crush something in a

cellophane wrapper on the driver's side of the vehicle. After approaching the Kia again, Patrolman Harper noticed a cellophane wrapper from a cigarette pack with a powdery white residue on the driver's side. He also observed what he referred to as "blunt guts," the tobacco removed from a cigar when someone uses the wrapper to roll a blunt, on the passenger side floorboard. In Patrolman Harper's experience, cellophane wrappers are often used to carry narcotics. Patrolman Chrisman did not participate in the search of the Kia.

After being removed from the Kia, Defendant was taken to the rear of the vehicle, where Patrolman Harper conducted a patdown of Defendant's person. Patrolman Harper first had Defendant place his hands on the trunk of the Kia, and he testified that Defendant removed his hands from the trunk at least once. Patrolman Harper also had to ask Defendant several times to spread his legs during the patdown. After Defendant removed his hands from the trunk, Patrolman Harper asked him to step away from the vehicle and place his hands on his head. During the patdown, Patrolman Harper felt a bulge in the front of Defendant's pants that did not feel like a part of Defendant's person. Patrolman Chrisman observed the patdown and testified that Defendant appeared agitated and that he was not following Patrolman Harper's directions. Defendant did not keep his hands on his head; instead, Defendant removed his hands from his head, brought his hands down, and grazed the left side of Patrolman Harper's head with his right arm. Patrolman Harper then placed Defendant under arrest for obstruction.

A search of Defendant's person incident to arrest revealed a large bag containing many substances in the front of Defendant's underwear. Patrolman Harper field tested the substances, and they came back positive for marijuana, cocaine hydrochloride, and cocaine base. Patrolman Harper was not able to field test the tablets found in the bag, but he used guides to identify them as Endocet

and Valium. A drug laboratory analysis further confirmed that these tables were Endocet or oxycodone.

## IV. CONTENTIONS OF THE PARTIES

### A. *Defendant's Motion to Suppress*

Defendant seeks to suppress all evidence obtained as a result of the traffic stop conducted on his vehicle on August 28, 2010. (Def.'s Mot. to Suppress ("Def.'s Mot"), ECF No. 18 at 1.) Specifically, Defendant alleges that Patrolmen Chrisman and Harper had no legitimate reason to stop his vehicle after he made a right turn without signaling because, as Defendant argues, West Virginia Code § 17-C-8-8(a) only requires drivers to signal a turn "when any other traffic may be affected by such movement." W. Va. Code § 17C-8-8(a); *see also Clower v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 535, 678 S.E.2d 41 (2009); (R. at 5). Furthermore, Defendant alleges that the patrolmen had no legitimate reason to search the vehicle or perform a patdown search of Defendant. (Def.'s Mot. at 6.) Finally, Defendant argues that the alleged obstruction of justice leading to Defendant's arrest was "neither forcible or illegal" because there is no evidence that Defendant intentionally struck Patrolman Harper on the head during the patdown. (*Id.* at 7.)

### B. *Government's Response*

In response, the Government argues that Patrolman Chrisman had probable cause to conduct the traffic stop because Patrolman Chrisman himself was affected by Defendant's failure to use his turn signal. (United States' Resp. to Def.'s Mot. to Supp. ("Gov't's Resp."), ECF No. 27 at 8.) The Government also asserts that Patrolman Chrisman had reasonable suspicion and probable cause to stop Defendant's vehicle "based upon the information known to him at the time he initiated the stop." (*Id.*) In its Response, the Government relies on *United States v. Corica*, in which the late

Judge Maxwell adopted Magistrate Judge Kaull's Report and Recommendation ("R&R") denying Corica's motion to suppress because of Corica's failure to signal. (*Id.* at 7-8); *see also Corica*, No. 2:09-cr-19, 2009 WL 3584130 (N.D. W. Va. Oct. 28, 2009).

## V.   DISCUSSION

### A.   *Patrolman Chrisman Had Probable Cause to Conduct a Traffic Stop of Defendant's Kia*

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, "'[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.''" *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Reasonableness is determined by "look[ing] at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (alteration in original); *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.").

A police officer's decision to stop a vehicle and briefly detain its passengers constitutes a "seizure" within the meaning of the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 810 (1996); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (citations omitted). Generally, an officer's decision to conduct a vehicle stop is reasonable when the officer has probable cause to believe that a traffic violation has occurred. *See Prouse*, 440 U.S. at 659; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (per curiam). An officer may also conduct a traffic stop if he has reasonable suspicion to do so. *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). Courts employ an objective test to determine whether a vehicle stop is constitutional. *See Whren*,

517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335.

The West Virginia Code provides that "[n]o person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other traffic may be affected by such movement." W. Va. Code § 17C-8-8(a). Recently, the Supreme Court of Appeals of West Virginia held that a motorist does not violate West Virginia Code § 17C-8-9, when "read in *para materia* with the provisions of" West Virginia Code § 17C-8-8(a), "where no other traffic may be affected by the movement of the motorist's vehicle." *Clower v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 535, 540, 678 S.E.2d 41, 46 (2009). In *Clower*, the court heard testimony that the officer's cruiser and Clower's vehicles were the only two vehicles on the roadway and that the officer was approximately two city blocks behind Clower's vehicle when he observed Clower make a turn without signaling. *Id.* at 537, 678 S.E.2d at 43. The *Clower* Court noted that an example of a situation where traffic would not be affected "is where a driver is on an isolated country road, with no other cars or pedestrians in sight, and the driver turns at an intersection without using a turn signal." *Id.* at 540, 678 S.E.2d at 46. Five months after *Clower* was decided, the late District Judge Maxwell adopted Magistrate Judge Kaull's R&R recommending that the defendant's motion to suppress be denied in *United States v. Corica*, No. 2:09-cr-19, 2009 WL 3584130 (N.D. W. Va. Oct. 28, 2009). In *Corica*, Magistrate Judge Kaull noted that "[t]he test is not whether the officer can remember it at a hearing or trial. Instead, it is a more objective test of whether the circumstances

that confronted the officer at the time of the event justify the action taken." *Corica*, 2009 WL 3584130, at *9. Magistrate Judge Kaull determined that Corica violated West Virginia Code § 17C-8-9, when read with West Virginia Code § 17C-8-8(a), because the trooper himself may have been affected by Corica's failure to signal before turning. *Id.*

The undersigned finds that Defendant's case is more factually similar to the situation in *Corica* than the situation in *Clower*. Although Patrolman Chrisman testified that his cruiser and Defendant's red Kia Rio were the only vehicles on the road at the time of the traffic stop, he also testified that he was fifteen (15) to twenty (20) feet behind the Kia when it turned. Patrolman Chrisman also testified that he had to apply his brakes when Defendant made the right turn onto Alonzo Drive without signaling. Like in *Corica*, Patrolman Chrisman himself was affected by Defendant's failure to signal before turning. *See Corica*, 2009 WL 3584130, at *9. Accordingly, because Patrolman Chrisman personally observed Defendant commit a traffic violation, he had probable cause to conduct a vehicle stop of the red Kia Rio Defendant was driving. *See Whren*, 517 U.S. at 810; *Prouse*, 440 U.S. at 659; *Mimms*, 434 U.S. at 110-11; *Branch*, 537 F.3d at 335.

## B.     *The Patrolmen Had Reasonable Suspicion to Request to Search Defendant's Car*

As mentioned above, a police officer who personally observes a traffic violation is "justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle." *Branch*, 537 F.3d at 337. During this stop, the officer is also permitted to "order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Mimms*, 434 U.S. at 111 n.6. In 1997, the Supreme Court extended this rule to apply to passengers as well. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997). However, if an officer wishes to extend the length of the traffic stop for investigatory

purposes, he must have either reasonable suspicion or the driver's consent. *Branch*, 537 F.3d at 337. A determination of whether reasonable suspicion exists "must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Furthermore, the officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also Branch*, 537 F.3d at 337. Nervous behavior is "a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124 (citations omitted). Furthermore, courts should give credit to "the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

Here, Patrolmen Chrisman and Harper were permitted to order Defendant and the passengers out of the vehicle during the traffic stop. *See Wilson*, 519 U.S. at 410 *Mimms*, 434 U.S. at 111 n.6. Furthermore, the facts establish that the patrolmen had reasonable suspicion to request to search the Kia Rio. Furthermore, Patrolman Chrisman testified at the evidentiary hearing that he observed Michael Kearn, the backseat passenger, in a "state," and that he was not sure if Kearn was entirely alright. Patrolman Harper noted that after all the occupants had been removed from the vehicle, he noticed that Kearn looked nervous. Kearn told Patrolman Harper that they had just come from Hagerstown and that he had seen Defendant stuff a large bag down the front of his pants right before the traffic stop. Goodwin, the front seat passenger, also told Patrolman Harper that he had seen Defendant crush something in a cellophane wrapper on the driver's side of the vehicle. Finally, Patrolman Harper personally observed the cellophane wrapper that contained white residue on the driver's side and "blunt guts," the tobacco taken out of a cigar, on the passenger's side floorboard. Patrolman Harper further testified that from his experience, he knew that cellophane wrappers from

packs of cigarettes are often used to carry narcotic substances. After considering the totality of the circumstances, the undersigned finds that the patrolmen had reasonable suspicion to request to search Defendant's car.[1] *See Wardlow*, 528 U.S. at 124-25; *Terry*, 392 U.S. at 21; *Branch*, 537 F.3d at 337.

In sum, the undersigned finds that Patrolman Chrisman had probable cause to conduct a traffic stop of the Kia Rio Defendant was driving. Furthermore, the undersigned finds that Patrolmen Harper and Chrisman had reasonable suspicion to request to search the Kia Rio. Accordingly, it is recommended that Defendant's Motion to Suppress (ECF No. 18) be **DENIED.**

## VI. RECOMMENDATION AND CONCLUSION

For the reasons articulated above, I find that Defendant's Motion to Suppress (ECF No. 18) should be **DENIED**.

Within fourteen (14) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this Report and Recommendation. The party should clearly identify the portions of the Report and Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to The Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Report and Recommendation. 28 U.S.C. § 636(b)(1).

---

[1] Nonetheless, the undersigned notes that Defendant gave consent for the patrolmen to search the Kia Rio, and Defendant has not argued that his consent was involuntarily given. Therefore, even though the patrolmen had reasonable suspicion to request to search the car, the patrolmen would also be justified in extending the traffic stop because of Defendant's consent. *Branch*, 537 F.3d at 337.

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **14th** day of **October, 2011.**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE