**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA**

    Plaintiff,

v.                                        **CRIMINAL ACTION NO. 3:11-CR-30
(BAILEY)**

**DOUGLAS DEMETRIOUS STARLING,**

    Defendant.

**ORDER ADOPTING REPORT AND RECOMMENDATION**

**I.**    **Introduction**

On this day, the above-styled matter came before the Court for consideration of the Report and Recommendation of United States Magistrate Judge David J. Joel. By Local Rule, this action was referred to Magistrate Judge Joel for submission of a proposed report and recommendation ("R&R"). Magistrate Judge Joel filed his R&R on October 14, 2011 [Doc. 33]. In that filing, the magistrate judge recommends that this Court deny the defendant's Motion to Suppress [Doc. 18], filed September 29, 2011.

Pursuant to 28 U.S.C. § 636 (b)(1)(c), this Court is required to make a *de novo* review of those portions of the magistrate judge's findings to which objection is made. However, the Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. ***Thomas v. Arn***, 474 U.S. 140, 150 (1985). In addition, failure to file timely objections constitutes a waiver of *de novo*

review and the right to appeal this Court's Order. 28 U.S.C. § 636(b)(1); **Snyder v. Ridenour**, 889 F.2d 1363, 1366 (4th Cir. 1989); **United States v. Schronce**, 727 F.2d 91, 94 (4th Cir. 1984). Here, objections to Magistrate Judge Joel's R&R were due on or before October 31, 2011. The defendant filed his objections in a timely manner on October 26, 2011 [Doc. 36]. Accordingly, this Court will review the R&R under a *de novo* standard.

## II. Background

### A. Indictment

On May 17, 2011, the defendant, Douglas Demetrious Starling, was charged in a one-count Indictment [Doc. 1] of possessing with the intent to distribute 17.83 grams of crack cocaine and 67 tablets of Oxycodone on August 27, 2010, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

### B. Motion to Suppress

On September 29, 2011, the defendant filed the instant Motion to Suppress [Doc. 18]. In that motion, the defendant asks this Court to suppress "any and all evidence derived from the traffic stop conducted by [Patrolman E.L.] Chrisman and [Patrolman J.L.] Harper in the early morning hours of August 27, 2010 and the subsequent search and seizure of the Defendant." (Id. at 7). In support of his request, the defendant argues that Patrolman Chrisman did not have a proper basis to stop his vehicle because his failure to use a signal light did not affect traffic, as required to constitute a violation of W.Va. Code § 17-C-8-8(a). (Id. at 4-5). In addition, the defendant argues that Patrolman Chrisman and Patrolman Harper did not have reasonable suspicion to conduct a patdown search of his person or a search of the vehicle. (Id. at 5-7). Finally, the defendant argues that the

alleged obstruction of justice leading to the defendant's arrest was "neither forcible or illegal" because there is no evidence that the defendant intentionally struck Patrolman Harper on the head during the patdown. (Id. at 7).

On October 11, 2011, the Government filed its Response [Doc. 27], opposing suppression. Specifically, the Government argues that Patrolman Chrisman himself was affected by the defendant's failure to signal his turn establishing probable cause for the traffic stop and that the defendant consented to the subsequent search of the vehicle. (Id. at ¶¶ 10, 26).

### C. Suppression Hearing

On October 12, 2011, Magistrate Judge Joel conducted an evidentiary hearing in connection with the defendant's motion to suppress [Doc. 31]. Following that hearing, the magistrate judge made the following findings of fact in his October 14, 2011, R&R:

> At the hearing held on October 12, 2011, Lieutenant Terry Stanley, an officer who has served twenty-two (years) with the Martinsburg City Police Department ("MCPD"), testified that he has lived at 2002 Alonzo Drive for nine years. The neighboring house, at 2004 Alonzo Drive, was owned by a Charles Michael Gerber at the time the incident with Defendant occurred. Lieutenant Stanley testified that he observed several people, including Defendant, residing at 2004 Alonzo Drive. He also noticed increased foot and vehicle traffic at Mr. Gerber's house. Particularly, Lieutenant Stanley noted that foot and vehicle traffic would arrive at all times throughout the day and night, and that vehicles only stayed for an average of five (5) minutes before leaving. After observing this behavior for some time and relying on his training and experience, Lieutenant Stanley believed that illegal activity, including drug activity, was occurring at 2004 Alonzo Drive. He shared these concerns with other members of the MCPD, including Patrolman Edward Chrisman. Lieutenant Stanley testified that not only did he work with Patrolman Chrisman, but that he had known Patrolman Chrisman for twelve (12) years and was very good friends with him. Patrolman Chrisman has been to Lieutenant Stanley's home at 2002 Alonzo Drive for social visits more times than Lieutenant Stanley could count.

Lieutenant Stanley testified that he often observed a red Kia Rio parked outside of 2004 Alonzo Drive. He often saw Mr. Gerber and Defendant drive this Kia Rio, and he noted that the Kia was always outside of the residence except when Defendant would leave the house. Lieutenant Stanley testified that he often observed Defendant leave for twelve (12) to twenty-four (24) hours at a time; however, foot and vehicle traffic greatly increased each time Defendant returned to 2004 Alonzo Drive. Lieutenant Stanley shared this information with Patrolman Chrisman, and he also testified that Patrolman Chrisman had also had opportunities to observe the red Kia Rio during his visits to Lieutenant Stanley's home.

Patrolman Edward Chrisman, who has served with the MCPD for six (6) years, also testified at the evidentiary hearing. Patrolman Chrisman explained that he was familiar with the red Kia Rio because he had seen it parked at 2004 Alonzo Drive several times when visiting Lieutenant Stanley at 2002 Alonzo Drive. Patrolman Chrisman also testified that when visiting Lieutenant Stanley, he often saw vehicles approach 2004 Alonzo Drive for very short periods of time throughout all hours of day and night. During several occasions, he saw Mr. Gerber or Angela Holt, another resident of 2004 Alonzo Drive, get into the Kia and drive away. The Kia would leave for fifteen (15) minutes, come back to 2004 Alonzo Drive for an hour, leave for another fifteen (15) minutes, come back, and continue this pattern. Patrolmen Chrismen [sic] never saw Defendant operating the red Kia Rio and never saw Defendant personally during any of his visits to Lieutenant Stanley's house.

During the early morning of August 27, 2011, Patrolman Chrisman was sector officer for the area of Martinsburg encompassing Alonzo Drive. As he testified, the sector officer is the primary responding officer for a specific area of the city, and all calls, unless sent to another officer, are routed to that officer. Around 4:00 a.m., Patrolman Chrisman was maintaining a stationary patrol on the south side of the Domino's Pizza at the intersection of Wilson Street and Winchester Avenue. He did not have his headlights on during this stationary patrol. From this vantage point, Patrolman Chrisman observed a red Kia Rio stopped at the street light at the intersection of Wilson Street and Winchester Avenue. Once the Kia was again traveling southbound, Patrolman Chrisman left his stationary patrol and activated his headlights once he was behind the Kia. He testified that he observed that it was the same Kia Rio he had seen at 2004 Alonzo Drive because of the New Jersey license plate and because he had the license plate number memorized. While following the Kia, Patrolman Chrisman was about fifteen (15) to twenty (20) feet behind the Kia, and he could see the license plate. He observed the Kia make a sudden right turn onto Alonzo Drive without signaling, and Patrolman Chrisman activated his emergency lights to make a traffic stop. Patrolman Chrisman had to apply his brakes when the Kia made the sudden right turn. Defendant stopped the Kia in the driveway of 2004 Alonzo Drive. Once he made the stop, Patrolman Chrisman noted that there were multiple

individuals in the Kia, and he requested that dispatch send another officer to the scene. While waiting for another officer, Patrolman Chrisman approached the Kia and identified the driver as Defendant. Around this time, Patrolman Chrisman also noticed that Michael Kearn, the backseat passenger, appeared to be in a 'state," and so he asked Kearn if he was alright.

Patrolman Justin Harper, an officer with the MCPD for almost five (5) years, responded Patrolman Chrisman's traffic stop. Patrolman Harper was also aware of Lieutenant Stanley's concerns about 2004 Alonzo Drive through conversations at the police department. Patrolman Chrisman asked Defendant if there were any weapons or drugs in the vehicle, and Defendant replied that there were not. Patrolman Chrisman then asked Defendant for permission to search the vehicle, Defendant granted permission, and all occupants were ordered to step out of the vehicle. During this time, Patrolman Harper was speaking with Kearn, the backseat passenger. Patrolman Harper testified that Kearn appeared nervous, and that Kearn informed him that they had come from Hagerstown, Maryland. Kearn also told Patrolman Harper that he had seen Defendant stuff something down the front of his pants right before the stop. The front seat passenger, a Mr. Goodwin, also informed Patrolman Harper that he had seen Defendant crush something in a cellophane wrapper on the driver's side of the vehicle. After approaching the Kia again, Patrolman Harper noticed a cellophane wrapper from a cigarette pack with a powdery white residue on the driver's side. He also observed what he referred to as "blunt guts," the tobacco removed from a cigar when someone uses the wrapper to roll a blunt, on the passenger side floorboard. In Patrolman Harper's experience, cellophane wrappers are often used to carry narcotics. Patrolman Chrisman did not participate in the search of the Kia.

After being removed from the Kia, Defendant was taken to the rear of the vehicle, where Patrolman Harper conducted a patdown of Defendant's person. Patrolman Harper first had Defendant place his hands on the trunk of the Kia, and he testified that Defendant removed his hands from the trunk at least once. Patrolman Harper also had to ask Defendant several times to spread his legs during the patdown. After Defendant removed his hands from the trunk, Patrolman Harper asked him to step away from the vehicle and place his hands on his head. During the patdown, Patrolman Harper felt a bulge in the front of Defendant's pants that did not feel like a part of Defendant's person. Patrolman Chrisman observed the patdown and testified that Defendant appeared agitated and that he was not following Patrolman Harper's directions. Defendant did not keep his hands on his head; instead, Defendant removed his hands from his head, brought his hands down, and grazed the left side of Patrolman Harper's head with his right arm. Patrolman Harper then placed Defendant under arrest for obstruction.

> A search of Defendant's person incident to arrest revealed a large bag containing many substances in the front of Defendant's underwear. Patrolman Harper field tested the substances, and they came back positive for marijuana, cocaine hydrochloride, and cocaine base. Patrolman Harper was not able to field test the tablets found in the bag, but he used guides to identify them as Endocet and Valium. A drug laboratory analysis further confirmed that these tables were Endocet or oxycodone.

([Doc. 33] at 2-6).

Based upon the factual findings quoted above, Magistrate Joel made two conclusions of law in his R&R. First, the magistrate judge concluded that Patrolman Chrisman had probable cause to conduct a traffic stop of the defendant's vehicle. (Id. at 7). More specifically, the magistrate judge found that Patrolman Chrisman had reason to believe that the defendant had violated W.Va. Code § 17C-8-8(a) by failing to use his signal light. (Id. at 9). In so finding, the magistrate judge emphasized that "Patrolman Chrisman . . . testified that he had to apply his brakes when Defendant made the right turn onto Alonzo Drive without signaling." (Id.). Thus, the magistrate judge concluded that because "Patrolman Chrisman himself was affected by Defendant's failure to signal before turning," "he had probable cause to conduct a vehicle stop of the red Kia Rio Defendant was driving." (Id.) (citations omitted).

Second, the magistrate judge concluded that Patrolmen Chrisman and Harper had reasonable suspicion to request to search the defendant's vehicle. (Id. at 9). In particular, the magistrate judge found that this reasonable suspicion arose from Patrolman Chrisman's observation that Michael Kearn, the backseat passenger, was in a "state." (Id. at 10). In this regard, the magistrate judge also noted that "Patrolman Harper personally observed the cellophane wrapper that contained white residue on the driver's side and 'blunt guts,'

the tobacco taken out of a cigar, on the passenger's side floorboard." (Id.). Alternatively, the magistrate judge found that the patrolmen were also justified in extending the traffic stop based upon the defendant's consent to search the vehicle. (Id. at 11 n. 1). Accordingly, the magistrate judge recommends that this Court deny the defendant's motion to suppress.

## III. Discussion

In his Objections [Doc. 36], timely filed on October 26, 2011, the defendant takes issue with certain of the magistrate judge's findings of fact and both of his conclusions of law. Below, this Court will consider each of the defendant's objections in turn.

### A. Findings of Fact

With regard to the findings of fact, the defendant argues that the magistrate judge failed to state that: (1) Patrolman Chrisman began following the defendant's vehicle because he had recognized it from his social visits to the home of Lieutenant Stanley, another Alonzo Drive resident; (2) Patrolman Chrisman also testified that he was five or six car lengths behind the defendant's vehicle; (3) Patrolman Chrisman testified that the right turn onto Alonzo Drive is more of a veer to the right and nearly akin to a fork in the road; (4) Patrolman Chrisman testified that it was not he, but Patrolman Harper, who ordered the occupants out of the vehicle after he arrived on the scene minutes after Patrolman Chrisman had received consent to search the vehicle; and (5) the cellophane and "blunt guts" were found after all passengers had exited the vehicle, been interviewed, and the defendant was placed in custody. (Id. at 2-4). According to the defendant, each of these omissions "relate directly to the legality of the initial stop and the credibility of the witness

7

testimony regarding the circumstances of the search of the vehicle and the Defendant." (Id. at 4).

Below, this Court has considered the facts outlined above and which the defendant argues were omitted from the magistrate judge's findings of fact. Accordingly, this Court **OVERRULES AS MOOT** the defendant's Objections to the extent he argues that Magistrate Judge Joel omitted relevant facts from his findings of facts outlined in the R&R.

**B.    Conclusions of Law**

**1.    Probable Cause to Conduct Traffic Stop**

The temporary detention of a motorist upon probable cause to believe that he has violated the traffic laws does not violate the Fourth Amendment's prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective. See **Whren v. United States**, 517 U.S. 806, 809-819 (1996). Here, the traffic law involved is W.Va. Code § 17C-8-8(a), which states that "[n]o person shall turn any vehicle without giving an appropriate signal . . . in the event any other traffic may be affected by such movement."

In his Objections, the defendant argues that the magistrate judge erred in concluding that Patrolman Chrisman had probable cause to conduct the traffic stop. (Id. at 5). The defendant challenges two of the magistrate judge supporting legal findings, namely: (1) that Patrolman Chrisman was part of traffic and (2) that Patrolman Chrisman was affected by the defendant's failure to signal. (Id. at 5-6). The Court will now consider each challenge in turn.

### i.  Part of Traffic

The defendant asserts that the magistrate judge should have concluded that Patrolman Chrisman was not part of traffic because he did not move from his stationary patrol position until he recognized the vehicle, he did not turn on his headlights until he was behind the vehicle, and he was on duty and investigating the vehicle for which he had memorized the license plate number.  (Id. at 5-6).  This Court disagrees.

W.Va. Code § 17C-8-8(a) requires a motorist to give an appropriate signal before a turn "in the event *any* other traffic may be affected by such movement."  (Emphasis added).  The Legislature defines "traffic" as "pedestrians, ridden or herded animals, *vehicles*, streetcars, and other conveyances either singly or together while using any highway for purposes of travel."  W.Va. Code § 17C-1-50.  A "vehicle" is further defined as "every device in, upon or by which any person or property is or may be transported or drawn upon a highway, except devices moved by human power or used exclusively upon stationary rails or tracks or wheelchairs."  W.Va. Code § 17C-1-2.

Applying these provisions to the instant case, there is no question that Patrolman Chrisman was part of traffic, as contemplated in W.Va. Code § 17C-8-8(a).  First, Patrolman Chrisman's patrol car fits within, and is not excepted from, the definition of "vehicle." See W.Va. Code § 17C-1-2.  Second, the definition of "traffic" lists "vehicles" generally without providing an exception for law enforcement vehicles.  See W.Va. Code § 17C-1-50. Finally, the Legislature's use of the term "any" in W.Va. Code § 17C-8-8(a) itself is unaccompanied by an exception for law enforcement vehicles.  Therefore, like the magistrate judge, this Court finds that Patrolman Chrisman was part of traffic for purposes

of W.Va. Code § 17C-8-8(a).[1]  Accordingly, this Court **OVERRULES** the defendant's Objections to the extent he argues that Patrolman Chrisman was not part of traffic.

### ii. Affected by Failure to Signal

The defendant contends that Patrolman Chrisman's testimony that he was five or six car lengths behind his vehicle and that the right turn onto Alonzo Drive is more of a veer right should have led the magistrate judge to discredit Patrolman Chrisman's testimony that the defendant's failure to signal caused him to apply his brakes. (Id. at 5).

In ***Clower v. W.Va. DMV***, 223 W.Va. 535, 678 S.E.2d 41 (2009), the Supreme Court of Appeals of West Virginia held as follows:

> Based upon our review of Article 8 of Chapter 17C of the Code, we conclude that the clear legislative intent behind the requirement of using a turn signal is to warn others of the motorist's intent to make a turn; however, the Legislature also clearly intended to qualify the requirement that a motorist use a turn signal to those occasions *where others could be affected by the turning vehicle*. Accordingly, a motorist who makes a turn at an intersection without first using a turn signal to notify others of the intent to make the turn does not violate the provisions of W.Va. Code, 17C-8-9, read in *para materia* with the provisions of W.Va. Code, 17C-8-8(a), *where no other traffic may be affected by the movement of the motorist's vehicle*.

(Emphasis added).

Here, Patrolman Chrisman testified that he had been affected by the defendant's failure to signal before turning onto Alonzo Drive because he had to apply his brakes when

---

[1]This Court is also persuaded by the late Honorable Robert E. Maxwell's adoption of a report and recommendation of Magistrate Judge John S. Kaull, wherein the magistrate judge recommended the denial of a defendant's motion to suppress after recognizing as significant that a law enforcement officer "may have been affected" himself by a defendant's failure to signal, as required in W.Va. Code § 17C-8-8(a). *See **United States v. Corica***, 2009 WL 3584130, *9 (N.D. W.Va. Oct. 28, 2009).

10

the defendant made the turn without any notice:

> Q. When he made that turn onto Alonzo Drive, did his unsignaled turn have any effect on your own driving?
>
> A. It caused me to slow down a little bit.
>
> Q. So you used your brakes?
>
> A. That's correct.

([Doc. 37] at 57). Based in part on this testimony, the magistrate judge concluded that Patrolman Chrisman had been affected for the purposes of W.Va. Code 17C-8-8(a). ([Doc. 33] at 9).

In objecting to this conclusion pursuant to 28 U.S.C. § 636(b)(1), therefore, the defendant is challenging to the magistrate judge's implicit finding that Patrolman Chrisman's testimony was credible. However, this Court is clearly not required to conduct a second hearing to consider the credibility of Patrolman Chrisman. In fact, the Supreme Court of the United States held in 1980 that "to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts." **United States v. Raddatz**, 447 U.S. 667, 676 n. 3 (1980). Instead, the Supreme Court explained that "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." **Id.** at 676 (citation omitted); see also **Proctor v. State Gov. of N.C.**, 830 F.2d 514, 518 n. 2 ("The

Supreme Court [in *Raddatz*] ruled that a 'de novo determination' is not necessarily the same as a de novo hearing and that the decision to rehear testimony is within the sole discretion of the district judge, even as to those findings based on the magistrate's judgment as to the credibility of witnesses before him.") Finally, the Supreme Court found it "unlikely that a district judge would *reject* a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal," noting that "to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach." ***Raddatz.*** 447 U.S. at 681 n. 7 (emphasis in original).

In ***United States v. Powell***, 628 F.3d 1254, 1257 (11th Cir. 2010), the Eleventh Circuit held that a district court's failure to hold a new hearing prior to rejecting the magistrate judge's credibility determination violated due process. In so holding, the Eleventh Circuit stated as follows:

> To adequately determine the credibility of a witness the fact finder must observe the witness. This requirement is satisfied either by the district judge accepting the determination of the magistrate after reading the record, or by rejecting the magistrate's decision and coming to an independent decision after hearing the testimony and viewing the witnesses.

*Id.* at 1257 (alterations, citations, and quotations omitted). As such, "[t]he first step is for the district judge to review the record, including the transcript, and to determine whether the entire record supports the magistrate judge's findings. If the magistrate judge's findings are supported by the record, the finding can be adopted by the district judge. If the magistrate judge's finding could not be adopted on the basis of the record, then the district judge would hold an additional hearing and make his own determination." ***United States***

*v. Jones*, 2011 WL 2160339, *5 (C.D. Ill. June 1, 2011); *see also* **Johnson v. Knable**, 1991 WL 87147, *1 (4th Cir. May 28, 1991) ("To conduct proper *de novo* review when testimony calling into question a witness's credibility is dispositive of a case, the appellate court must be satisfied that the district judge has exercised his non-delegable authority by considering the actual testimony, and not merely by reviewing the magistrate judge's report.").

In this case, the Court has reviewed the entire record, including the transcript and exhibits, and finds that the record supports Magistrate Judge Joel's credibility finding regarding the above-quoted portion of Patrolman Chrisman's testimony. Therefore, there is no need for an additional hearing. Accordingly, the Court **OVERRULES** the defendant's Objections to the extent he argues that Patrolman Chrisman was not credibly affected by his failure to signal.

### 2. Reasonable Suspicion to Request to Search Vehicle

Finally, the defendant argues that the magistrate judge erred in concluding that Patrolmen Chrisman and Harper had reasonable suspicion to request to search his vehicle. ([Doc. 36] at 6). Specifically, the defendant emphasizes that the nervous behavior of Kearns and the presence of the "blunt guts" and cellophane in the vehicle could not constitute reasonable suspicion because "none of these facts were known to Patrolman Chrisman prior to his request of the Defendant for consent to search the vehicle." (Id. at 6-7). Nevertheless, the defendant concedes that "[t]he Magistrate Judge correctly notes that reasonable suspicion is not necessary if the Defendant voluntarily consents to a search of the vehicle." (Id. at 7). In this regard, the defendant notes that he "has not, at this point

13

in his case, conceded that consent was given, or argued that there was no consent. However, the Defendant does point out that Patrolman Chrisman's testimony is all the evidence that has been presented to support the notion that consent was asked for and received." (Id.).

At the suppression hearing, Patrolman Chrisman testified as follows:

Q.    Did you have any conversations with Mr. Starling in regard to the vehicle?

A.    Yes, ma'am.

Q.    And what was the nature of that?

A.    I asked him if I could search the vehicle. He gave consent. . . .

([Doc. 37] at 29).

In his R&R, Magistrate Judge Joel noted that "Defendant gave consent for the patrolmen to search the Kia Rio, and Defendant has not argued that his consent was involuntarily given. Therefore, . . . the patrolmen would also be justified in extending the traffic stop because of Defendant's consent." ([Doc. 33] at 11 n. 1) (citing **United States v. Branch**, 537 F.3d 328, 337 (4th Cir. 2008)). In **Branch**, the Fourth Circuit explained that a "driver's consent *or* reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes." **Branch**, 537 F.3d at 337 (emphasis added).

Here, the defendant does not dispute that pursuant to **Branch** his consent would justify extending the traffic stop at issue for investigatory purposes. ([Doc. 36] at 7). The defendant also does not argue "at this point in his case" (which is all that matters for the

purposes of the instant motion) that any consent he may have given was involuntary. Instead, the defendant again appears to base his entire objection on the contention that Magistrate Judge Joel erred in finding Patrolman Chrisman's testimony credible.

As before, the Court has reviewed the entire record, including the transcript and exhibits, and finds that the record supports Magistrate Judge Joel's credibility finding regarding the above-quoted portion of Patrolman Chrisman's testimony. Therefore, there is no need for an additional hearing. Accordingly, the Court **OVERRULES** the defendant's Objections to the extent he argues that Patrolman Chrisman was not credibly given consent to search the vehicle.

## IV.     Conclusion

Upon careful review of the record, it is the opinion of this Court that the magistrate judge's R&R **[Doc. 33]** should be, and is, hereby **ORDERED ADOPTED** for the reasons more fully stated therein. Accordingly, the defendant's Motion to Suppress **[Doc. 18]** is hereby **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record.

**DATED:** November 9, 2011.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE